UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JAY LOY,

        Plaintiff,

                                            Case Number 09-12728-BC
v.                                        Honorable Thomas L. Ludington

B & P PROCESS EQUIPMENT &
SYSTEMS, L.L.C.,

        Defendant.

_____ /

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT**

Plaintiff Jay Loy contends that his former employer, Defendant B&P Process Equipment and

Systems, L.L.C., breached a contract for the payment of sales commissions after Plaintiff voluntarily

resigned his position as a sales representative on September 1, 2008. Defendant manufactures,

installs, and services commercial mixing systems in a variety of industries. Plaintiff began working

for Defendant in 2005, selling spare parts to existing customers, and was promoted a year later to

sell both new systems and parts. Plaintiff contends that he is owed $75,482.75 in unpaid

commissions plus $100,000 in additional damages pursuant to the Michigan Sales Representative

Commissions Act because Defendant "intentionally failed to pay the commission when due." Mich.

Comp. Laws § 600.2961(5)(b).

Plaintiff initially filed his complaint in Saginaw County Circuit Court on June 22, 2009. The

case was removed to this Court by Defendant on July 10, 2009. In the notice of removal, Defendant

alleged jurisdiction was proper based on diversity of citizenship because Plaintiff is a citizen of

Georgia and Defendant is a "corporate citizen of the State of Michigan." On June 9, 2010, the Court

issued an order to show cause why the case should not be remanded given Defendant's contention

that it is a Michigan citizen. *See* 28 U.S.C. § 1941(b) (prohibiting removal on the basis of diversity

if any defendant is a citizen of the state where the case was filed). Defendant's response to the order

to show cause indicated that it is not a "corporate citizen of the State of Michigan" at all, rather, it

is a limited liability company with its headquarters in Michigan. All of its members live in other

states, making removal proper.

On March 26, 2010, Defendant filed a motion for summary judgment contending that

Plaintiff is not owed any commissions under the terms of the contract, that Plaintiff was not the

"procuring cause" of a sale that accounts for the bulk of the disputed commissions, and that

Plaintiff's Sales Representative Commissions Act claim should be dismissed. [Dkt. # 7–11].

Plaintiff filed a response on June 7, 2010 [Dkt. # 17], and Defendant filed a reply on August 19,

2010 [Dkt. # 23]. On September 14, 2010, the hearing scheduled for September 16, 2010 was

canceled based on the Court's determination that the parties' papers adequately explained the factual

and legal issues before the Court. *See* E.D. Mich. L.R. 7.1(f). For the reasons stated below, the

motion will be denied.

**I**

Plaintiff was hired by defendant as a salesman on October 24, 2005 and promoted to a

position as an account manager on January 31, 2008. Pl.'s Compl. ¶ 9. Also on January 31, 2008,

Plaintiff and Defendant entered into a contract that provided for payment of sales commissions to

Plaintiff. [Dkt. # 7-6]. The agreement provided for a base salary of $72,000 plus acquisition

commissions for all sales and bonus commissions for sales that exceeded yearly targets. *Id.* The

agreement provided that Plaintiff would receive a one percent bonus commission on all sales of new

equipment that exceeded $10 million per year. *Id.* The agreement also provided for a two percent

bonus commission on all sales of spare parts that exceeded $1 million per year. *Id.*

The agreement states that bonus commissions would be paid "in the next regularly scheduled

bi-weekly pay cycle following the close of the month" in which the contract was accepted or the

equipment was delivered. *Id.* The agreement further provides that if an employee voluntarily or

involuntarily leaves his position, the employee is

> eligible to receive sales compensation as outlined in this Plan for all sales
> transactions that have been accepted as of the date of your departure. To avoid
> overpayments that may occur if the transactions in question are not accepted by the
> company, are cancelled, are subject to credits, charge-backs or incomplete billing,
> or lapse into bad debt, B&P Process Equipment reserves the right to hold back 25%
> of these payments until such time as the risk of overpayment has reasonably passed.

*Id.* ¶ 15.

On April 1, 2008, Plaintiff and Defendant's then-CEO Ray Miller negotiated and signed a

"letter of intent" with an Indian company called Vedanta for the sale of three continuous mixers

designed to be used in the aluminum smelting process. [Dkt. # 8-4]. The letter of intent provided

that Defendant would deliver the three machines to a Vedanta plant in India, provide various

services, and provide spare parts in exchange for $5,496,860. *Id.* ¶ 2. The delivery dates for the

machines were indicated as February, May, and June 2009. *Id.* ¶ 5. The letter of intent called for

both parties to sign a "detailed Contract" within sixty days. *Id.* ¶ 10. It further provided that "[t]he

Contract shall become effective and the completion schedule shall be reckoned from the date of

issue of this LOI ie. 1st April, 2008." *Id.* ¶ 3. The letter of intent was signed by officials from

Vedanta and Defendant. Defendant began work on the three mixers shortly after receiving the letter

of intent in an effort to comply with the delivery dates, even though Defendant's managers contend

they did not consider either party to be bound by the letter of intent.

The "detailed Contract" required by the letter of intent was not signed within sixty days. According to Defendant, Vedanta intentionally stalled and avoided contact with Defendant. Def.'s Mot. at 4–5. Defendant contends that it understood from its course of dealing with Vedanta that Vedanta would not honor the letter of intent. Defendant's managers believed Vedanta was stalling in an attempt to negotiate a price concession. *Id.* On September 4, 2008, Vedanta returned the detailed contract, unsigned, to Defendant. Def.'s Mot. at 5. Defendant's managers immediately re-executed the contract and returned it to Vedanta, where it was finally executed on October 18, 2008. *Id.*

On September 5, 2008, Plaintiff apparently drafted a memorandum under the name of Robert Lytkowski, Defendant's national sales manager, to Larry Slovin, Defendant's CEO. [Dkt. # 10-5]. The memorandum provides: "This memo is to inform that Jeremy Loy is owed by B&P Process Equipment a sum of $162,513 for commissions earned during his employment at B&P per the B&P Sales Plan which outlines the payment of commission." *Id.* The memorandum is signed by Plaintiff, Lytkowski, and Clay Chargot, another manager. The sum included a $19,250 acquisition commission for the Vedanta sale and a $39,773 bonus commission. Pl.'s Resp. at 4. The Vedanta sale is required for Plaintiff to surpass the $10 million sales target for 2008, or he does not qualify for bonus commission at all. *Id.*

On September 12, 2008, Plaintiff voluntarily resigned his position at Defendant. On October 18, 2008, Defendant signed a detailed contract with Vedanta. Def.'s Mot. at 5. The three mixers were delivered to Vedanta on time in 2009, but Defendant refused to pay Plaintiff any commissions associated with the Vedanta sale. Plaintiff contends in his response to Defendant's motion for

summary judgment that he is entitled to the $39,773 bonus commission, the $19,250 acquisition commission, and $16,459.75 in other commissions for a total of $75,482.75 in commissions. He further contends that he is entitled to a $100,000 award under Mich. Comp. Laws §600.2961(5)(b) because Defendant "intentionally failed to pay the commissions when due." Defendant contends that it is not obligated to pay commissions for the Vedanta sales because the "sales transaction" was not "accepted" until after Plaintiff left his employment with Defendant.

## II

A motion for summary judgment should be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. Pro. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If the opposing party does not raise genuine issues of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. *Anderson*, 477 U.S. at 250.

The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. The party opposing the motion may not "rely on the hope that the

trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252.

## III

Resolving Defendant's motion for summary judgment requires the Court to determine whether the Vendata "sales transaction" was "accepted" as of September 12, 2008 pursuant to the sales commission contract. In Michigan, the construction or interpretation of a contract that is clear and unambiguous is a question of law that should be decided by the Court. *Bandit Indus., Inc. v. Hobbs Int'l, Inc.*, 463 Mich. 504, 511 (2001). "Parties are presumed to understand and intend what the language employed clearly states." *Twp. of Chestonia v. Twp. of Star*, 266 Mich. App. 423, 432 (2005). The language used should be given its "plain and ordinary meaning, avoiding technical and constrained constructions." *English v. Blue Cross Blue Shield of Mich.*, 263 Mich. App. 449, 471 (2004). However, questions of fact concerning ambiguous provisions in the contract and the parties intentions with respect to those provisions should be reserved for the trier of fact. *See Port Huron Educ. Ass'n v. Port Huron Area Sch. Dist.*, 452 Mich. 309, 323 (1996) ("Where the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact.") (citation omitted).

## 1

Defendant first contends that the "sales transaction" to Vedanta was not "accepted" before September 12, 2008 because a contract had not yet been signed by the parties. Defendant contends

the term "accepted" is clear and unambiguous and should be construed by the Court as a matter of law. Defendant contends that to be "accepted," a sales transaction must be completed—the product delivered and compensation tendered—or that a contract for a future sale must be completed. Def.'s Mot. at 10. Defendant contends that because the goods were not exchanged until 2009 and the contract was not signed until October 18, 2008, the transaction was not "accepted" as of September 12, 2008 when Plaintiff resigned. Defendant contends that neither it nor Vendata considered the letter of intent to be binding, and as a result, the letter of intent cannot be a contract for future sale that triggers a commission obligation. Defendant emphasizes that it had not received a deposit or a letter of credit to confirm or guarantee the transaction at the time Plaintiff left his employment.

Plaintiff responds that the letter of intent itself is a contract for the sale of three mixers and demonstrates that the "sales transaction" was "accepted" more than five months before he resigned his employment. Plaintiff contends that the "accepted" requirement is unambiguous and satisfied by the letter of intent, and, alternatively, that even if the term is ambiguous, material fact issues bar Defendant's motion for summary judgment.

Plaintiff emphasizes that the letter of intent is five pages long and contains a rather detailed discussion of the terms of the sale, it is initialed on each page, and it is signed by Defendant's former CEO as well as Vendata representatives. Plaintiff emphasizes that Defendant began work on the mixers shortly after the letter of intent was signed, as Defendant needed to do to meet the first delivery date in February 2009. According to Plaintiff, "before the date that B&P obtained a signature by Vedanta on the Vedanta contract, the material was ordered, subcontractors were notified to start construction[,] and kick-off meetings" were held in reliance on the letter of intent. Pl.'s Resp. at 8. Moreover, both the October 18, 2008 contract and the April 1, 2008 letter of intent

specifically provide for a "commencement date" or "effective date" of April 1, 2008. [Dkt. # 9-2 art. 7; 8-4 ¶ 3].

Defendant has not demonstrated the absence of a material issue of fact as to whether the "sales transaction" was initially "accepted" after Plaintiff resigned his employment. First, although the technical terms of the contract were not finalized before Plaintiff left his employment, the critical terms of the contract, including price and delivery dates, were in place and remained largely unchanged. Moreover, Defendant acted in reliance on the delivery dates provided in the letter of intent—construction of the mixers began several months before Plaintiff resigned his employment. Defendant was concerned about whether the letter of intent could be enforced and was apparently anxious to secure a letter of credit to ensure payment, but those facts do not, on their own, show that the transaction had not been "accepted." As the sales commission agreement makes clear, Defendant was entitled to hold back twenty-five percent of commission payments, and to recover the remaining seventy-five percent from former employees, to protect itself in the event a sales transaction was canceled or a debt became uncollectible. [Dkt. 7-6 ¶ 15]. Indeed, use of the word "accepted" suggests that the commissions could become payable before transactions were completed or funds were received. If Defendant intended to withhold commissions until "sales transactions" were completed or finalized, as opposed to "accepted," it could have selected that language for the commission agreement.

It is also notable that the contract itself, although not signed be Vedanta until October 18, 2008, had been finalized and signed by Defendant before Plaintiff resigned his employment. Def.'s Resp. at 12. The fact that the contract was drafted and signed by Defendant before Plaintiff resigned is some evidence that Defendant had "accepted" the final terms of the contract even if it had not yet

secured a binding contract with Vedanta. Similarly, although not signed by Vedanta until mid-October, the contract provides for a "commencement date" of April 1, 2008. The evidence suggests that the final contract was a memorialization of specific terms, which finalized a bargain that was negotiated and "accepted" several months earlier.

Finally, the September 5, 2009 memorandum, although of questionable origin and evidentiary weight, at least suggests that Plaintiff's national sales manager, Lytkowski, believed Plaintiff was entitled to commissions associated with the Vedanta sale. Although Lytkowski apparently did not draft the memorandum, he signed it and provided it to CEO Slovin.

In summary, Defendant's motion for summary judgment will be denied because it has not met its burden of demonstrating that Plaintiff is not entitled to commissions associated with the Vedanta sale. Notably, Plaintiff did not file a cross-motion for summary judgment. Accordingly, the case is scheduled for a bench trial beginning on December 14, 2010.

**2**

Defendant next contends that the "procuring cause" doctrine is inapplicable to this case because the parties' sales compensation agreement specifically addresses the company's obligation to pay commissions following the end of the employment relationship. Def.'s Mot. at 13. Plaintiff contends that he was the "procuring cause" of the Vedanta sale, but he does not address Defendant's argument concerning the applicability of the doctrine in this situation. Pl.'s Resp. at 12; *see also Reed v. Kurdziel*, 352 Mich. 287 (1958) (concluding that a manufacturer's sales representative may be entitled to commissions for certain sales that occurred after the termination of the agency relationship between the manufacturer and the sales representative).

The procuring cause doctrine provides an avenue for a sales representative to recover

commissions from a manufacturer for sales that occurred after the relationship between the manufacturer and sales representative ends. *Reed*, 352 Mich. at 294–96. But it does not permit a Court to ignore the plain language of an express contract. *See Clark Bros. Sales. Co. v. Dana Corp.*, 77 F. Supp. 2d 837, 847–50 (E.D. Mich. 1999) (Rosen, J.). Here, the sales compensation agreement specifically provided that Plaintiff is entitled to commissions only for those sales that were "accepted" before his voluntary resignation. Accordingly, whether he was the "procuring cause" of additional sales is irrelevant.

**3**

Defendant next contends that because Plaintiff is not entitled to the Vendata commissions pursuant to the terms of the sales compensation agreement, his Michigan Sales Representative Commissions Act Claim must also be dismissed. Mich. Comp. Laws § 600.2961(5)(b). The statute provides that "[t]he terms of the contract between the principal and sales representative shall determine when a commission becomes due." Mich. Comp. Laws § 600.2961(2). It further provides that "[a]ll commissions that are due at the time of termination of a contract between a sales representative and principal shall be paid within 45 days after the date of termination. Commissions that become due after the termination date shall be paid within 45 days after the date on which the commission became due." Mich. Comp. Laws § 600.2961(4). If a principal does not pay commissions when they become due, the principal will be liable for:

> (a) Actual damages caused by the failure to pay the commissions when due.
> (b) If the principal is found to have intentionally failed to pay the commission when due, an amount equal to 2 times the amount of commissions due but not paid as required by this section or $100,000, whichever is less.

Mich. Comp. Laws § 600.2961(5).

Here, Defendant has not demonstrated that it has complied with all the obligations imposed

by the statute, including the obligation to pay commissions due under the compensation agreement. Accordingly, Defendant is not entitled to summary judgment on Plaintiff's Sales Representative Commissions Act claim.

**IV**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [Dkt. # 7] is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: September 21, 2010

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 21, 2010.

s/Tracy A. Jacobs
TRACY A. JACOBS

---