UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JAY LOY,

        Plaintiff,

v.

        Case Number 09-12728-BC
        Honorable Thomas L. Ludington

B & P PROCESS EQUIPMENT &
SYSTEMS, L.L.C.,

        Defendant.

_____ /

**OPINION AND ORDER ESTABLISHING THE COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On June 22, 2009, Plaintiff Jay Loy filed a two-count complaint in Saginaw County Circuit Court, alleging claims for breach of contract and violation of the Michigan Sales Representative Commission Act, Mich. Comp. Laws § 600.2961, against his former employer, Defendant B&P Process Equipment & Systems, L.L.C. Plaintiff alleged that Defendant breached a contract for the payment of sales commissions after Plaintiff voluntarily resigned his position as a sales representative on September 12, 2008. Defendant manufactures, installs, and services commercial mixing systems in a variety of industries. Plaintiff began working for Defendant in 2005, selling spare parts to existing customers, and was promoted a year later to sell both parts and new systems. Plaintiff contended in his complaint that he is owed $75,482.75 in unpaid commissions plus $100,000 in additional damages pursuant to the Michigan Sales Representative Commission Act because Defendant "intentionally failed to pay the commission when due." Mich. Comp. Laws § 600.2961(5)(b).

Plaintiff initially filed his complaint in Saginaw County Circuit Court on June 22, 2009. The case was removed to this Court by Defendant on July 10, 2009. In the notice of removal, Defendant alleged jurisdiction was proper based on diversity of citizenship because Plaintiff is a citizen of Georgia and Defendant is a "corporate citizen of the State of Michigan." On June 9, 2010, the Court issued an order to show cause why the case should not be remanded given Defendant's contention that it is a Michigan citizen. *See* 28 U.S.C. § 1941(b) (prohibiting removal on the basis of diversity if any defendant is a citizen of the state where the case was filed). Defendant's response to the order to show cause indicated that it is not a "corporate citizen of the State of Michigan" at all, rather, it is a limited liability company with its headquarters in Michigan. All of its members live in other states, making removal proper. Because none of Defendant's members are a citizen of Michigan or Georgia and the amount in controversy, excluding interest and costs, is more that $75,000, this Court has original jurisdiction over the case. 28 U.S.C. § 1331.

On September 21, 2010, the Court issued an order denying Defendant's motion for summary judgment. The case proceeded to a bench trial, which was conducted pursuant to Federal Rule of Civil Procedure 52 on December 14 and 15, 2010. At the conclusion of the trial, the Court issued certain findings from the bench, but deferred other conclusions for later consideration. The Court concluded that Plaintiff was entitled to the acquisition commissions he was seeking, but it remained unclear whether he was entitled to a bonus commission. The Court directed additional briefing on whether Plaintiff was entitled to the bonus commission. The briefs have now been received and reviewed by the Court. The Court's findings of fact and conclusions of law are set forth below in memorandum form. The findings of fact are set forth in narrative form based on the Court's conclusion that it is the most expeditious manner of proceeding where there are few disputes about

facts and the main focus of the controversy is the interpretation of the sales compensation agreement. *See* Fed. R. Civ. P. 52(a)(1) (providing that a court's findings of fact may be set forth in "an opinion or memorandum of decision").

## I. Findings of Fact

Plaintiff was hired by Defendant as a salesman on October 24, 2005 and promoted to a position as an account manager on January 31, 2008. Also on January 31, 2008, Plaintiff and Defendant entered into a contract that provided for the payment of sales commissions to Plaintiff. The agreement provided for a base salary of $72,000 plus acquisition commissions for all sales and bonus commissions for sales that exceeded yearly targets. The agreement provided that Plaintiff would receive a one percent bonus commission on all "Sales Revenue" arising from the sale of new equipment that exceeded $10 million per fiscal year. The agreement also provided for a two percent bonus commission on certain sales of spare parts, which are not at issue here. The applicable bonus commission language provides:

> **Sales Revenue** for the purposes of commission calculations is equal to invoiced revenue as reflected in the purchase contract, net of shipping charges and applicable taxes.
>
> . . .
>
> **Bonus Commission:** Once your cumulative Sales Revenue within the current fiscal year exceeds your assigned annual Sales Target, you are eligible for a Bonus Commission. The Bonus Commission is applied only to Sales Revenue dollars above you annual Sales Target and is earned in addition to the regular Acquisition Commission.

The agreement provides that bonus commissions would be paid "in the next regularly scheduled bi-weekly pay cycle following the close of the month" in which the contract was accepted or the equipment was delivered. The agreement further provides that if an employee voluntarily or

involuntarily leaves his position, the employee is

> eligible to receive sales compensation as outlined in this Plan for all sales transactions that have been accepted as of the date of your departure. To avoid overpayments that may occur if the transactions in question are not accepted by the company, are cancelled, are subject to credits, charge-backs or incomplete billing, or lapse into bad debt, B&P Process Equipment reserves the right to hold back 25% of these payments until such time as the risk of overpayment has reasonably passed.

It was the company's practice to pay commissions as they received payment from the customer. Thus, sales persons would receive a percentage of the acquisition commission when the customer's first payment was received for the order. Defendant would pay an additional percentage of the acquisition commission with each progress payment made by the customer, and the remainder of the acquisition commission when the company received payment in full, normally at delivery. No sales person had ever earned a bonus commission. As a result, Defendant did not have a standard practice for paying bonus commissions.

On April 1, 2008, Plaintiff and Defendant's then-CEO, Ray Miller, traveled to India where they negotiated and signed a "letter of intent" with an Indian company called Vedanta for the sale of three continuous mixers designed to be used in the aluminum smelting process. Plaintiff was credited for making the sale and negotiating the terms of the letter of intent. The letter of intent provided that Defendant would deliver the three machines to a Vedanta plant in India, provide various services, and provide spare parts in exchange for $5,496,860. The delivery dates for the machines were indicated as February, May, and June 2009. The letter of intent called for both parties to sign a "detailed Contract" within sixty days. It further provided that "[t]he Contract shall become effective and the completion schedule shall be reckoned from the date of issue of this LOI ie. 1st April, 2008." The letter of intent was signed by officials from Vedanta and Defendant.

Defendant began work on the three mixers shortly after receiving the letter of intent in an effort to comply with the delivery dates. By signing the letter of intent and beginning work on the mixers, which were custom built to Vedanta's specifications, Defendant "accepted" the sale within the meaning of the sales compensation agreement and Plaintiff was eligible to receive commissions for the sale. Defendant's then-CEO, Ray Miller, acknowledged that the sale was "accepted" when the letter of intent was signed.

The "detailed Contract" required by the letter of intent was not signed within sixty days. Plaintiff had some responsibility for securing the detailed contract. It was Defendant's typical practice for the sales agents to work with the contract manager to secure a detailed contract. While the contract manager was responsible for the contract itself, the sales agent would assist with client communication. The usual practice was followed with regard to the Vedanta contract.

Defendant was concerned, based on prior dealings with companies in India, that Vedanta would not honor the letter of intent. Indeed, Vedanta moved slowly on finalizing the detailed contract likely to gain concessions on the terms from Defendant. Despite these concerns and the slow pace of detailed contract negotiations, Defendant continued the manufacturing process with the goal of filling the Vedanta order on time in 2009.

On September 4, 2008, Vedanta returned the detailed contract, unsigned, to Defendant. Defendant's managers immediately re-executed the contract and returned it to Vedanta, where it was finally executed on October 18, 2008.

On September 5, 2008, Plaintiff drafted a memorandum under the name of Robert Lytkowski, Defendant's national sales manager, to Larry Slovin, Defendant's CEO. The memorandum provides: "This memo is to inform that Jeremy Loy is owed by B&P Process

Equipment a sum of $162,513 for commissions earned during his employment at B&P per the B&P Sales Plan which outlines the payment of commission." Plaintiff, Lytkowski, and Clay Chargot, another manager, signed the memorandum. Lytowski, as the sales manager, was responsible for approving commission payments, but the payments were subject to review by the CEO. The sum contained in the memo included a $19,250 acquisition commission for the Vedanta sale, a $75,000 acquisition commission for a sale to "Outotec," three smaller commissions worth a total of $28,490, and a $39,773 bonus commission for reaching his 2008 "Sales Revenue" target for new machines. But for the "Sales Revenue" associated with the Vedanta sale, Plaintiff would not have reached his 2008 target for the sale of new machines. Defendant recorded new sales and projected commissions with spreadsheets. The figures listed in the spreadsheets, which were signed and approved by Defendant's accounting personnel, are consistent with the memorandum.

On September 12, 2008, Plaintiff voluntarily resigned his position at Defendant. The three mixers were delivered to Vedanta on time in 2009 after extensive efforts by Slovin to hold the transaction together, pursuant to the terms of the letter of intent and the contract.

In January 2009, Plaintiff began e-mailing Slovin about his commissions, asking when they would be paid. Slovin and Lytowski responded by assuring Plaintiff that he would be paid all commissions that were due. Plaintiff continued to pressure Slovin about the commissions, ultimately noting in a February 3, 2009 e-mail that if he was not paid soon, he would "take this matter to a third party to insure legal corrective action." In a January 27, 2009 response to one of Plaintiff's e-mails, Slovin assured Plaintiff that he had reviewed the compensation agreement with Lytowski and that Plaintiff would be paid the commissions he was owed. Slovin wrote: "The two of us are in total agreement as to the plan rules etc and what is payable under the plan rules." Slovin

followed up the same day, addressing the Vedanta project directly.

> Bob [Lytowski] will call you shortly to review the payments. I apologize but I inadvertently left out the issue with Vedanta. There is considerable questions as to the likelihood of this project progressing at each stage. Our current [letters of credit] are not collectable and we do not have [a letter of credit] for the 3rd machine. All payments to you will not include Vedanta until the Vedanta project is complete. Upon the completion of Vedanta, we will calculate your commission and bonus as per our agreement and pay for the complete project.

Slovin addressed this e-mail, and whether it was a promise to pay an acquisition commission and bonus commission with regard to the Vedanta project, at the trial. He admitted that he had never read the compensation plan, despite his representations to the contrary. He acknowledged that he did not know much about the terms of the plan. He testified that he remembered sending the January 27 e-mail, and continued under the questioning of Defendant's attorney:

> Q       And what's going on at that point in time? Can you give us the context, if any, that surrounded you sending that particular e-mail on that particular date?
> A       I believe it started -- I believe, you know, the first time Mr. Loy received some e-mails and calls, I think, started in December. And early on I explained to him the situation.
>         Apparently Mr. Loy also had communication with a customer because he told us that we received this payment and received that payment. And I said: Jay, that hasn't happened. And he got a little bit more belligerent with me and just kept on sending -- calling and leaving voice mails.
>         I said I sent them to Bob Lytkowski because, quite frankly, you know, I just didn't have the time or the patience to deal with it at that point.
>         This e-mail was really the culmination of that where I just -- I knew he was talking to the customer, I just didn't know what to do and I thought -- I did that really just to buy me sometime till I could really sort this whole thing out. It just wasn't -- it just wasn't high on the radar scope.
> Q       There's a line in there that says: Mr. Loy, we will calculate your commission and bonus as per our agreement.
>         Do you believe that you have done that as you sit here today?
> A       Yes.

Ultimately, Defendant did not pay Plaintiff any commission associated with the Vedanta sale. All other commissions were paid on time and in accordance with the terms of the plan. Defendant

made a deliberate choice not to pay Plaintiff any commissions associated with the Vedanta sale based on its later conclusion that the Vedanta commissions were not owed to Plaintiff under the terms of their agreement. The decision not to pay Plaintiff the Vedanta commissions was made in good faith and based on a tenable legal understanding of the circumstance. The decision was a reversal, however, of the earlier representation by Lytkowski that Defendant would pay the Vedanta commissions. The decision was also contrary to the Slovin e-mail and the company's internal accounting documents.

## II. The Parties Arguments

Plaintiff contends he is owed an $18,975 acquisition commission on the Vedanta sale. He further contends that he is owed a $39,773 bonus commission. He further contends that he is entitled to an "amount equal to 2 times the amount of commissions due" or $100,000, whichever is less, pursuant to Mich. Comp. Laws §600.2961(5)(b), because Defendant "intentionally failed to pay the commissions when due." Defendant contends that it is not obligated to pay commissions for the Vedanta sales because the "sales transaction" was not "accepted" until after Plaintiff left his employment with Defendant. Defendant further contends that it is not obligated to pay the bonus commission, even if it must pay the Vedanta acquisition commission, because the bonus targets are based on "Sales Revenue," which requires that Defendant actually be paid for the sale during the applicable fiscal year. Finally, Defendant contends the double-damages provision is not applicable because it had a good faith legal argument for refusing to pay the Vedanta Commission.

There are four distinct legal issues, then, that the Court must address: first, whether Plaintiff is entitled to the acquisition commission for the Vedanta sale pursuant to the terms of the compensation agreement; second, whether Plaintiff is entitled to the bonus commission for the

-8-

Vedanta sale pursuant to the terms of the compensation agreement; third, if Plaintiff is not entitled to the bonus commission under the agreement, whether Defendant waived its right to contest Plaintiff's eligibility for the bonus commission through the Slovin e-mail and the Lytowski memo; fourth, whether Defendant "intentionally failed to pay" any commissions due to Plaintiff within the meaning of the Michigan Sales Representative Commission Act. Mich. Comp. Laws § 600.2961.

### III. Conclusions of Law

The first issue is whether Plaintiff is entitled to an acquisition commission for the Vedanta sale. The contract provides that if a sales representative's employment is terminated, that representative will receive commissions for all eligible "sales transactions that have been accepted as of the date of your departure." The parties agree that Plaintiff's eligibility for the Vedanta acquisition commission depends on whether the sales transaction was accepted as of September 12, 2008. They disagree as to what the term "accepted" means. The contract does not define the term.

The construction or interpretation of a contract that is clear and unambiguous is a question of law that should be decided by the Court. *Bandit Indus., Inc. v. Hobbs Int'l, Inc.*, 463 Mich. 504, 511 (2001). "Parties are presumed to understand and intend what the language employed clearly states." *Twp. of Chestonia v. Twp. of Star*, 266 Mich. App. 423, 432 (2005). The language used should be given its "plain and ordinary meaning, avoiding technical and constrained constructions." *English v. Blue Cross Blue Shield of Mich.*, 263 Mich. App. 449, 471 (2004). Where contract terms are ambiguous, however, the parties intentions with respect to those provisions can become a question of fact. *See Port Huron Educ. Ass'n v. Port Huron Area Sch. Dist.*, 452 Mich. 309, 323 (1996) ("Where the contract language is unclear or susceptible to multiple meanings, interpretation becomes a question of fact.") (citation omitted).

Because "accepted" is not defined by the contract, it must be given its plain and ordinary meaning. *English*, 263 Mich. App. at 471. The verb "accept" can mean a variety of things in different contexts. One can "accept" a gift or a job offer happily, but, in a different sense, one can also "accept" a punishment or bad news from a doctor begrudgingly. "Accept" can also be understood as a commitment to follow through on a duty or obligation; as in, "I accept my responsibility as an officer of the Court to uphold and defend the Constitution." *See The Random House College Dictionary* 8 (Rev. ed. 1975). When used in a commercial agreement, the use of "accept" in the sense that one party is assuming a duty or obligation to another party is most appropriate.

Thus, the sales transaction to Vedanta was "accepted" by Defendant when Defendant assumed a duty to follow through and deliver the continuous mixers. Before Plaintiff left his employment, Defendant had signed the letter of intent, completed, or nearly completed, negotiations of the detailed contract, ordered parts, begun constructing the mixers, and entered the sale into its spreadsheets used for computing commissions. Defendant's then-CEO testified that he believed the transaction had been accepted. Defendant had assumed a duty to deliver the mixers to Vendanta in accordance with the terms of the letter of the intent even though the parties had not yet executed the detailed contract. Defendant had accepted the Vedanta contract as of September 12, 2008 when Plaintiff left his employment.

This conclusion is supported by other provisions of the compensation plan. For example, although the agreement did not define the term accepted, it included a provision cautioning sales representatives that acceptance of a sale did not necessarily mean the sale was final. The provision provides that the company "at its discretion, [may] cancel or may permit a customer to cancel, a

sales transaction in whole or in part at any point up to or after acceptance of the sales transaction by either party." If a sale was canceled after acceptance, the employee would receive no commission.

The second issue is whether Plaintiff is entitled to a bonus commission pursuant to the compensation plan. The plan provides for a bonus commission when "cumulative Sales Revenue within the current fiscal year" exceeds that representative's annual target. The agreement further provides that "Sales Revenue for the purposes of commission calculations is equal to *invoiced revenue* as reflected in the purchase contract." (emphasis added). Thus, whether or not Plaintiff is entitled to a bonus commission under the terms of the contract depends on whether the Vedanta sale should be counted toward "invoiced revenue" in 2008.

According to Defendant, its revenue for the Vedanta project was not invoiced in 2008. Although the Vedanta sale was accepted by Defendant in 2008 before Plaintiff left his employment, the bulk of the revenue from the sale was not realized until 2009 when the progress payments were made and 2010 when the final payment was made. Vedanta made an initial payment on the project of approximately $500,000 in November 2008. Defendant contends that revenue is "invoiced" when payment is received from the customer.

Plaintiff, by contrast, contends that "invoiced revenue" should be read to mean "booked sales." First, while explaining the bonus provisions, the compensation plan provides an example suggesting that, in Plaintiff's view, the bonus will be based on booked sales. The example provides:

> As a demonstration of how the Bonus Commission is calculated, consider a hypothetical example using an Account Manager with an annual Sales Target of $2,000,000 and a Bonus Commission rate of 1%. Also assume that for the purposes of this example, the Account Manager has accumulated a total of $1,900,000 in Sales Revenue on a year-to-date basis. If the Account Manager should then close a sales transaction worth $500,000, the Bonus Commission rate would be applied to the amount over and above [the Account Manager's] annual Sales Target to generate a Bonus commission of $4,000 . . . .

Plaintiff contends that because the hypothetical Account Manager was entitled to a bonus based on closing the $500,000 sale, it is booked sales and not received revenues that matter for the purposes of calculating bonus commissions. Second, Plaintiff emphasizes that Defendant's conduct demonstrates that the company itself interpreted "invoiced revenue" to mean revenue recorded in Defendant's financial statements. The company's internal tracking system for computing commissions computed a bonus commission for Plaintiff after the Vedanta transaction was accepted and entered into the spreadsheet; Lytkowski signed the memorandum Plaintiff drafted, suggesting that Plaintiff was entitled to the bonus commission; and Slovin sent Plaintiff an e-mail seemingly acknowledging that Plaintiff was entitled to a bonus commission.

Ultimately, the meaning of the bonus provision is not clear on its face. But the parties intentions, as reflected by their actions, suggest that Plaintiff's interpretation of the contract corresponds to their practice. Lytowski, the sales manager who was responsible for approving commissions, signed a memorandum reflecting his understanding that Plaintiff was entitled to the bonus commission. The company's internal accounting system for keeping track of commissions also reflected Plaintiff's entitlement to a bonus commission. Even Slovin, although his testimony in court did not reflect the lucid understanding of the compensation agreement one might expect from the person with ultimate responsibility for approving commissions, sent Plaintiff an e-mail implying that Slovin believed Plaintiff was entitled to a bonus commission.

Importantly, when a contract is clear and unambiguous, the terms of the contract must be enforced as written. *See Bandit Indus., Inc.*, 463 Mich. at 511. But where, as here, the language of the contract is not clear on its face, the Court must look beyond the words to determine the parties intentions. *See Port Huron Educ. Ass'n*, 452 Mich. at 323. The parties actions reflect an

-12-

understanding that commissions would be paid based on the year in which the sales transactions were booked, not the year in which the revenue was received. Accordingly, Plaintiff was also entitled to a bonus commission based on his 2008 sales.

Moving to the third issue, even if Plaintiff were not entitled to a bonus commission based on the language of the compensation plan, Defendant may well have waived any right it had to refuse to pay the bonus commission by including the commission in the spreadsheet calculations, Lytkowski's memo, and Slovin's e-mail. As Plaintiff emphasizes, based on the spreadsheet and his understanding of the compensation plan, he believed he was entitled to the bonus commission. He confirmed his understanding by securing Lytkowski's signature on the memorandum before he left. His understanding was further confirmed by Slovin's e-mail the following year.

In Michigan, the parties to a contract may waive or modify its terms as longs as they mutually agree to do so. *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 364–65 (2003). "[M]utuality is the centerpiece to waiving or modifying a contract, just as mutuality is the centerpiece to forming any contract." *Id.* Mutual waiver or modification of a contract "is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to modify or waive the particular original contract." *Id.*

The memo Lytowski signed provided that Plaintiff was entitled to $162,513 in commissions. Although it did not specifically state that Plaintiff was entitled to a bonus commission, the number identified in the memo was taken directly from one of Defendant's spreadsheets that was used to track commission payments. Lytowski knew, or should have known, when he signed the memo that he was approving payment of a bonus commission to Plaintiff.

Similarly, Slovin's e-mail provides that the Vedanta commissions would be calculated "per our agreement" when the project was completed. Slovin did not review the agreement before sending the e-mail. Indeed, he testified that he had never read the agreement at the time of the trial. Slovin sent the e-mail to "buy time," not consent to a modification of the agreement. Nevertheless, he suggested in the e-mail that Plaintiff was entitled to a bonus commission pursuant to the compensation plan.

The conduct of Defendant's managers with respect to the compensation plan and Plaintiff's entitlement to a bonus commission was best described as inattentive. Slovin admitted that his strategy, under the stress of many challenges, was to say anything he could to "buy time," without any knowledge or concern for the financial implications of his representations. More importantly for the purposes of this case, by signing the memo and sending the e-mail suggesting that Plaintiff was entitled to a bonus commission, Lytowski and Slovin may well have waived their right to withhold the bonus commission. *See Johnson Controls, Inc. v. Jay Indus., Inc.*, 459 F.3d 717, 725 (2006) (citing *Quality Prods. & Concepts Co.*, 469 Mich. at 374).

The final issue is whether Plaintiff is entitled to an additional award under the Michigan Sales Representative Commission Act because Defendant "intentionally failed to pay the commission when due." Mich. Comp. Laws § 600.2961(5)(b). The statute provides that "[t]he terms of the contract between the principal and sales representative shall determine when a commission becomes due." Mich. Comp. Laws § 600.2961(2). It further provides that "[a]ll commissions that are due at the time of termination of a contract between a sales representative and principal shall be paid within 45 days after the date of termination. Commissions that become due after the termination date shall be paid within 45 days after the date on which the commission

-14-

became due." Mich. Comp. Laws § 600.2961(4). If a principal does not pay commissions when they become due, the principal will be liable for "both of the following:"

> (a) Actual damages caused by the failure to pay the commissions when due.
> (b) If the principal is found to have intentionally failed to pay the commission when due, an amount equal to 2 times the amount of commissions due but not paid as required by this section or $100,000, whichever is less.

Mich. Comp. Laws § 600.2961(5).

The Michigan Supreme Court concluded in *In re Certified Question from the United States Court of Appeals for the Sixth Circuit*, 468 Mich. 109, 110–11 (2003), that whether an employer "intentionally failed to pay" a commission depends on whether the employer "purposely" did not pay the commission. Evidence of bad faith on the part of an employer is not required. *Id.* The court noted that the double damages provision is intended to be punitive, and thereby deter employers from withholding commissions. *Id.* at 112. The court continued:

> [U]nder the clear language of the statute, if a principal deliberately fails to pay a commission when due, it is liable for double damages under the statute, even if the principal did not believe, reasonably or otherwise, that the commission was owed. There is no textual indication that a principal's good faith belief is relevant in making the determination that double damages are payable under the statute.

*Id.* at 114.

Here, Defendant made a deliberate decision not to pay Plaintiff the Vedanta acquisition commission. Even though that decision was predicated on a good-faith legal argument that Plaintiff was not owed the Vedanta commission, Defendant is still obligated to pay Plaintiff's actual damages, just under $60,000, and the lesser of an amount equal to double Plaintiff's actual damages or $100,000 because the decision was intentional.

## IV

Accordingly, it is **ORDERED** that Defendant shall be liable to Plaintiff for the actual

amount of the Vedanta acquisition commission, or $18,975, plus the actual amount of the 2008 bonus commission, or $39,773, plus a $100,000 award under Mich. Comp. Laws § 600.2961(5)(b) because Defendant intentionally failed to pay the commissions when due, for a total liability of **$158,748**.

Pursuant to Rule 52(a)(1), a separate judgment must also be entered. Plaintiff's counsel is directed to meet and confer with Defendant's counsel regarding the appropriate calculation of prejudgment interest. Plaintiff's counsel shall submit a proposed judgment via the CM/ECF utilities function and also serve the proposed judgment on Defendant's counsel by e-mail on or before **August 11, 2011**. Defendant shall submit objections to the proposed judgment on or before **August 15, 2011**.

Any party seeking costs must file a bill of costs with the clerk in accordance with Local Rule 54.1. Any party seeking attorney fees must do so in accordance with Local Rule 54.1.2 and any applicable statute.

>                          s/Thomas L. Ludington
>                          THOMAS L. LUDINGTON
>                          United States District Judge

Dated: August 4, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 4, 2011.

>                   s/Tracy A. Jacobs
>                   TRACY A. JACOBS

---